UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X

GINTA LAPINA and GINGIN MANAGEMENT LTD.,

                        Plaintiff,                    14 Civ. 6890

        -against-                                     OPINION

MEN WOMEN N.Y. MODEL MANAGEMENT INC.
a/k/a & t/a WOMEN and a/k/a & t/a
Women Management & t/a Women Management
Inc. & t/a Women Model Management, Inc.;
WOMEN MANAGEMENT INC. a/k/a & t/a WOMEN
and a/k/a & t/a Women Management;
WOMEN MODEL MANAGEMENT INC. a/k/a & t/a
WOMEN and a/k/a & t/a Women Management;
MEN WOMEN MODEL MANAGEMENT INC. a/k/a/ &
t/a WOMEN and a/k/a & t/a Women
Management; WOMEN MANAGEMENT S.A.R.L. a/k/a
& t/a Women Paris and a/k/a & t/a WOMEN;
ELITE WORLD S.A. t/a WOMEN & t/a Women
Management; HENKEL OF AMERICA,
INC. a/k/a & t/a HENKEL CORPORATION and
t/a Henkel; HENKEL AG & Co., KGAA a/k/a
Henkel; KONINKLIJKE PHILIPS N.V. a/k/a
& t/a Royal Philips and a/k/a & t/a Philips;
and PHILIPS NORTH AMERICA CORPORATION
a/k/a & t/a Philips,

                        Defendants.

-------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2-6-15

A P P E A R A N C E S:

            Attorneys for Plaintiffs

            THE LAW OFFICES OF BENNETT D. KRASNER
            1233 Beech Street, No. 49
            Atlantic Beach, NY 11509
            By:  Bennett D. Krasner, Esq.

<u>Attorneys for Defendants</u>

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019

By:  Brian S. Kaplan, Esq.
     Daniel Turinsky, Esq.
     Evan D. Parness, Esq.

**Sweet, D.J.**

Defendant Men Women N.Y. Model Management Inc. ("Women NY") has moved to compel plaintiffs Ginta Lapina ("Lapina") and Gingin Management Ltd. ("Gingin," together with Lapina, the "Plaintiffs") to arbitrate their claims against Women NY.  Based on the conclusions set forth below, the motion is granted and the Plaintiffs are directed to proceed to arbitration.

**Prior Proceedings**

Plaintiffs filed their complaint ("Complaint") on August 25, 2014, alleging claims for unfair competition and trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(a) and (c) (Counts I and IV); violation of the New York Statutory Right of Publicity, New York Civil Rights Law §§ 50 and 51 (Count II); common law unfair competition (Count III); civil conspiracy (Count V); unjust enrichment (Count VI); breach of contract (Count VII); and breach of fiduciary duty (Count VIII).  Among the named defendants are Women NY; Women Management Inc. ("WMI"); Women Model Management Inc. ("WMMI"); Men Women Model Management Inc. ("Men Women"); Women Management S.A.R.L. ("Women Paris," together with Women NY, WMI, WMMI, and Men Women, the "Women Defendants"); Elite World S.A. ("Elite");

1

Henkel of America, Inc. ("HOA"); Henkel AG & Co., KGAA ("HAG," together with HOA, the "Henkel Defendants"); Koninklijke Philips N.V. ("KPNV"); and, Philips North America Corporation ("Philips NA," together with KPNV, the "Philips Defendants").[1]  Women NY filed its motion to compel arbitration on September 19, 2014.

The motion was heard and marked fully submitted on October 29, 2014.

**Facts**

The allegations of the Complaint are assumed to be true and are summarized only to the extent necessary to dispose of Women NY's motion to compel arbitration.  The facts recounted herein are drawn from the Complaint and the agreements between the parties which are described in detail below.

---

[1] Plaintiffs' Complaint alleges all counts against all named defendants with the exception of Counts VII and VIII, which are alleged against Elite and Women Defendants only.  Since the filing of Women NY's motion to compel, however: (1) the action has been stayed as to HOA until such time that Plaintiffs have served and obtained jurisdiction over HAG or cannot serve or obtain jurisdiction over HAG (see Dkt. No. 15) and (2) the Complaint has been dismissed without prejudice as against the Philips Defendants (see Dkt. No. 23).

Separately, Women NY contends that Men Women is "separate and distinct from, and unaffiliated with, Women NY.  (See Def.'s Mem. 1 n. 2; see also Leccese Decl. ¶ 4.)  Women NY also contends that the claims against WMI and WMMI should be dismissed and, in the alternative, although Women NY does not represent Men Women, WMI and WMMI, Women NY seeks to compel arbitration and/or to dismiss all claims asserted against them as a matter of law. (Def.'s Mem. 2 n. 2.)

Lapina is a "celebrity fashion model" who has been represented by Women NY, a New York-based model management company, since 2008, when she made her fashion runway debut. (Compl. ¶¶ 15, 32.)  Lapina "has gained significant U.S. and international public recognition in the modeling industry by virtue of her work in the industry since 2005," and "has created a brand in her image and persona subject to protection against infringement and dilution."  (Compl. ¶ 37.)  Gingin "owns the intellectual property rights to the celebrity image and persona of" Lapina, and is one of Lapina's representatives.  (Compl. ¶ 16.)  Elite is the majority owner of Women NY.  (Compl. ¶¶ 7, 22.)

Women Paris is a French affiliate of Women NY that "handled billing and collections" for Lapina in France.  (Compl. ¶¶ 21, 47.)

The Henkel Defendants are foreign corporations that market and distribute the Schwarzkopf line of hair care products, and the Philips Defendants are foreign corporations that market and distribute the Philips line of hair care products.  (Compl. ¶¶ 8-11, 23-26.)

On January 15, 2013, Lapina renewed her exclusive model management contract with WMI for a three-year term expiring on January 15, 2016 ("2013 Agreement"). (Compl. ¶ 38, Ex. B.) Pursuant to the 2013 Agreement, Lapina appointed and engaged WMI as her "sole and exclusive personal manager" for the entire term of the 2013 Agreement. (2013 Agreement ¶ 1.) WMI's responsibilities under the 2013 Agreement include, among other things, (i) providing advice and counsel to Lapina concerning "the selection or consideration of career opportunities, photographers and advertisers," "all matters pertaining to publicity, public relations and advertising," and general practices in the modeling industry; (ii) developing, negotiating, organizing, and administering "income producing opportunities available as a result of [Lapina's] stature in the fashion industry, including, without limitation, licensing, endorsement, personal appearances, and publishing opportunities;" (iii) sending invoices to clients and collecting fees earned by Lapina; and (iv) providing advice concerning requests to use Lapina's "name, photograph, likeness, or other item intended to make reference to [Lapina]." (Id.)

Under the 2013 Agreement, Lapina agreed to pay WMI a commission for the performance of its services, and acknowledged that WMI was not licensed "as an employment agency under the

4

general business law of the State of New York" and "has at all
times advised [Lapina] that it is not licensed to seek or obtain
employment or engagements for [Lapina] and [Women NY] does not
agree to do so." (2013 Agreement ¶¶ 2, 10(a).)  Lapina further
acknowledged in the 2013 Agreement that the performance of WMI's
services "is in the capacity of an independent contractor" and
not an employer. (2013 Agreement ¶ 10(b).)  Lapina granted WMI
"the right to use [Lapina's] name, likeness, voice, biography,
or other item intended to make reference to [Lapina] in
connection with promoting" Lapina and WMI. (2013 Agreement ¶
11(k).)  Each of Plaintiffs' claims against Women NY involves
these (and other) provisions of the 2013 Agreement.

Lapina, through Gingin, also entered into a separate
contract with Women Paris (the "Women Paris Agreement") which is
governed by French law.[2]  The Women Paris Agreement provides for
the "promotion, sale, exploitation or reproduction of the

---

[2] A copy of the 2013 Agreement is attached as Exhibit C to the Leccese
Declaration.  On a motion to dismiss, the court may review "any documents
attached to the complaint or incorporated into it by reference, any documents
that are 'integral' to the plaintiff's allegations even if not explicitly
incorporated by reference, and facts of which the Court may take judicial
notice." Gilman v. Marsh & McLennan Cos., 868 F. Supp. 2d 118, 127 (S.D.N.Y.
2012).  Plaintiffs' agreements with Women Paris are integral to the
allegations in the Complaint, and will be considered in connection with this
motion.

recording of the presentation of the MODEL[3] and the promotion or sale of the MODEL's services to the AGENCY's client-user's worldwide," and expressly states that Women Paris "will not be held liable in the event of violations on the part of third parties who have not observed the requirements for the assignment of rights." (Leccese Decl. Exh. C, Article 1, 2(A)). Women NY is not a party to the Women Paris Agreement.

The 2013 Agreement contains a dispute resolution clause:

> If a dispute arises between the parties hereunder or involving this Agreement, the disputing party shall give notice in writing to the other informing them of the matter in dispute and requesting its settlement. If such dispute cannot be resolved in fourteen (14) days between us, such dispute shall be submitted to confidential arbitration and resolved . . . by a single arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association as then in effect. All such arbitration shall take place at the New York, New York office of the American Arbitration [A]ssociation. . . . . The award or decision rendered by the arbitrator shall be final, binding and conclusive. . . .

(2013 Agreement, ¶ 11(l).)

---

[3] The Women Paris Agreement defines the "Model" as "GINGIN MANAGEMENT LTD" and "AGENCY" as "the French Limited Liability Company Women Management, SARL." (See Leccese Decl. Ex. C.)

On July 8 and 9, 2013, Lapina traveled to Paris to participate in a photo shoot "being taken by Karl Lagerfeld which would be included in an interview with Karl Lagerfeld called the Schwarzkopf Look 2014 Trends." (Compl. ¶ 48.)  In December 2013, Henkel allegedly requested that the Women Defendants and Elite "expand the scope of the limited license and use the Schwarzkopf Look 2014 advertorial worldwide (excluding the USA and Japan) . . . in connection with the Henkel Defendants' Schwarzkopf line of hair care products," and that Elite and the Women Defendants granted the expanded license without Plaintiffs' authorization.  (Compl. ¶¶ 50, 53.)  The alleged license expansion specifically excluded the United States.  (See Compl. ¶ 50.)

Elite and the Women Defendants granted the expanded license "to best serve the pecuniary and commercial interests of" the Henkel Defendants.  (Compl. ¶ 53.)  Lapina's 2013 Agreement provides that Women NY is compensated only through a commission based on the amounts paid to Lapina by clients using her as a model.  (2013 Agreement ¶ 2.)

Beginning in May 2014, the Plaintiffs learned that Lapina's image and persona were being used "in a massive unauthorized joint advertising campaign for Schwarzkopf hair

care products and the Philips Defendants hair care appliance
products." (Compl. ¶ 55.) Although Lapina voluntarily traveled
to Paris to participate in a photo shoot involving the
"Schwarzkopf Look 2014 Trends," the Schwartzkopf products "are
not of the caliber normally endorsed by a model of [Lapina's]
stature in the industry and have diluted her 'brand' as a model
for the haute couture and/or highest paying clients." (Compl.
¶ 52.) In addition, Lapina was not paid "the usual and
customary compensation that a top model commands" for the
Schwartzkopf advertising campaign. (Compl. ¶ 54.)


        After Plaintiffs learned of the alleged
misappropriation and use of Lapina's images, they "immediately
brought the Henkel Defendants' and the Philips Defendants'
infringing activities to the attention of . . . Elite and the
Women Defendants and advised that they had impinged on
Plaintiffs' rights of privacy and publicity, tarnished
[Lapina's] image, diluted her professional 'brand', and likely
caused confusion to the consuming public by creating false
association and false endorsement." (Compl. ¶ 59.)


        Women NY, Women Paris, and Elite breached their
contractual and fiduciary duties by, among other things, not
informing Lapina that her photos would be used for a worldwide

advertising campaign, failing to obtain proper compensation for the campaign, failing to properly advise Lapina as to the use of her image and failing to act in Lapina's best interests and to protect her "brand" against infringement. (Compl. ¶¶ 121-136.)

## The Motion To Compel Arbitration Is Granted

The Plaintiffs have contended that arbitration should not be compelled on the grounds that: (1) Women NY was not a signatory to the 2013 Agreement, (2) the 2013 Agreement is unenforceable because Women NY fraudulently concealed from Lapina the fact that the corporate signatories to the 2013 Agreement had been dissolved in 2011, and (3) the 2013 Agreement is illegal because its fee provisions violate Article 11 of the New York General Business Law, which establishes a ten percent commission cap for employment agencies.

The Federal Arbitration Act, 9 U.S.C. § 1 et seq. (2014) (the "FAA"), mandates arbitration where there is an agreement to arbitrate in a transaction involving interstate commerce. See 9 U.S.C. § 2 (2014); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-24 (1983); Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran, 445 F.3d 121, 125 (2d Cir. 2006).

Section 2 of the FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  This provision embodies the "liberal federal policy favoring arbitration agreements." CompuCredit Corp. v. Greenwood, 132 S. Ct. 665, 669 (2012); Moses H. Cone Mem'l Hosp., 460 U.S. at 24. Indeed, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.  Arbitration "must be preferred 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" Thomas James Assocs. v. Jameson, 102 F.3d 60, 65 (2d Cir. 1996) (citations omitted).

Section 4 of the FAA provides that a party may obtain an order "directing that [an] arbitration proceed in the manner provided for in [an arbitration] agreement," and section 3 of the FAA provides for a stay of legal proceedings when the Court is satisfied that the issue is arbitrable under an arbitration agreement.  9 U.S.C. §§ 3-4.  "In the context of motions to

compel arbitration . . . the court applies a standard similar to that applicable for a motion for summary judgment." Murray v. UBS Securities, LLC, No. 12 Civ. 5914(KPF), 2014 WL 285093, at *4 (S.D.N.Y. Jan. 27, 2014) (citations omitted).

Section 4 of the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985) (emphasis in original).

In the Second Circuit, to determine whether parties have agreed to submit a particular dispute to arbitration, courts must resolve four issues: "first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be non-arbitral; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." Oldroyd v. Elmira Sav. Bank, 134 F.3d 72, 75-76 (2d Cir. 1998) (citing Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 844 (2d Cir.

1987)).  Each of these factors weighs in favor of requiring
Plaintiffs to arbitrate.

### 1. Agreement To Arbitrate

It is well-settled "that when an arbitration clause
incorporates by reference the [AAA] rule that arbitrators are to
determine their own jurisdiction, this incorporation 'serves as
clear and unmistakable evidence of the parties' intent to
delegate such issues to an arbitrator.'  Therefore, a party who
signs 'a contract containing an arbitration clause and
incorporating by reference the AAA rules . . . cannot [later]
disown its agreed-to obligation to arbitrate all disputes,
including the question of arbitrability.'" Lismore v. Societe
Generale Energy Corp., No. 11. Civ. 6709(AJN), 2012 WL 3577833,
at *5 (S.D.N.Y. Aug. 17, 2012) (quoting Contec Corp. v. Remote
Solutions, Co. Ltd., 398 F.3d 205, 208 (2d Cir. 2005); see also
Bulkenstein v. Taptu, Inc., 2014 WL 5089385, at *3 (S.D.N.Y.
Oct. 9, 2014).  Specifically, where a party seeking to avoid
arbitration is a signatory to an arbitration agreement which
incorporates rules that delegate arbitrability questions to the
arbitrator, a court need not reach the issue of whether a non-
signatory may compel arbitration, because that is an issue
properly resolved by the arbitrator.  See Contec, 398 F.3d at

209 (holding that "neither we nor the district court must reach
the question whether [signatory] is estopped from avoiding
arbitration with [non-signatory] because, under the 1999
Agreement, the circumstances indicate that arbitration of the
issue of arbitrability is appropriate"); see also Thai-Lao
Lignite (Thailand) Co., Ltd. v. Gov't of Lao People's Democratic
Republic, No. 10 Civ. 5256(KMW), 2011 WL 3516154, at *20-21
(S.D.N.Y. Aug. 3, 2011) (holding that "the Court need not reach"
the issue of whether non-signatory could compel arbitration
because signatory signed agreement delegating such issues
concerning the scope of the arbitrator's jurisdiction to the
arbitrator to resolve).

        The Second Circuit has recognized that a signatory to
an arbitration agreement is estopped "from avoiding arbitration
with a non-signatory when the issues the non-signatory is
seeking to resolve in arbitration are intertwined with the
agreement that the estopped party has signed." Choctaw
Generation Ltd. P'ship v. American Home Assurance Co., 271 F.3d
403, 404 (2d Cir. 2001) (citations and quotation marks omitted).
The purpose of the equitable estoppel doctrine "is to prevent a
plaintiff from, in effect, trying to have [its] cake and eat it
too; that is, from rely[ing] on the contract when it works to
its advantage [by establishing the claim], and repudiat[ing] it

when it works to its disadvantage [by requiring arbitration]."
Birmingham Assocs. Ltd. v. Abbott Lab., 547 F. Supp. 2d 295, 301
(S.D.N.Y. 2008) (citations omitted).  Thus, in Birmingham, the
court found that the signatory to an agreement containing an
arbitration clause was estopped from avoiding arbitration with a
non-signatory because of the close relationship between the
parties and controversies involved and the fact that the
signatory's claims were "integrally related to the contract
containing the arbitration clause."  See Birmingham, 547 F.
Supp. 2d at 303-304.

Although the 2013 Agreement states that it was entered
into by and between Lapina and WMI and was signed on behalf of
WMI rather than Women NY, Women NY may compel Lapina to
arbitrate her claims.  Lapina was a signatory to the 2013
Agreement, which contains an arbitration clause incorporating
AAA rules that delegate all questions of arbitrability to the
arbitrator.  (Compl. ¶ 38; 2013 Agreement ¶ 11(l).).  Lapina
regularly received, inter alia, checks, wire transfers and
ledger statements from Women NY throughout the course of her
representation under the 2013 Agreement.  (See Leccese Decl. ¶
5).  Plaintiffs assert claims against Women NY for breach of the
2013 Agreement and allege that Women NY "controls" the
signatories to the 2013 Agreement and is the successor-in-

14

interest to them.   (Compl. ¶¶ 17, 43.)   Plaintiffs also allege
that the "Women Defendants," which by the Complaint's definition
includes Women NY (<u>see</u> Compl. ¶ 29), were to act as Lapina's
exclusive personal manager pursuant to the terms of the 2013
Agreement (Compl. ¶ 45).   In other words, Plaintiffs have
asserted that Women NY breached the 2013 Agreement containing
the very arbitration clause they seek to avoid.

Under these circumstances, the parties "have a
sufficient relationship to each other and to the rights created
under the agreement," that Women NY may compel arbitration.
<u>Contec Corp. v. Remote Solutions, Co. Ltd.</u>, 398 F.3d 205, 209-11
(2d Cir. 2005) (also noting that whether a non-party can enforce
an arbitration agreement, when that agreement incorporates AAA
rules, falls within the arbitrator's jurisdiction); <u>see also</u>
<u>Ragone v. Atlantic Video at Manhattan Ctr.</u>, 595 F.3d 115, 126-28
(2d Cir. 2010) (holding that non-signatory could compel
arbitration pursuant to the doctrine of equitable estoppel);
<u>Cartagena Enters., Inc. v. J. Walter Thompson Co.</u>, No. 13 Civ.
4238(SAS), 2013 WL 5664992, at *4-*5 (S.D.N.Y. Oct. 16, 2013)
(holding that plaintiff was equitably estopped from avoiding
arbitration with non-signatory because the claims against the
signatory and non-signatory were intertwined and the parties'
close relationship supported equitable estoppel).   Plaintiffs

are equitably estopped from avoiding arbitration as required under the 2013 Agreement while asserting claims that are linked with the provisions of that same agreement.

Separately, although Gingin is not a signatory to the 2013 Agreement, Plaintiffs "cannot avoid arbitration for which they had contracted simply by adding a non-signatory [party], lest the efficacy of contracts and the federal policy favoring arbitration be defeated."  See Danisco A/S v. Novo Nordisk A/S, No. 01 Civ. 10557(LTS), 2003 WL 282391, at *4 (S.D.N.Y. Feb. 10, 2003) (noting that plaintiffs "may not evade [their] obligation to arbitrate by naming [a non-signatory] as a party plaintiff in this action").

The Complaint alleges that Gingin "owns the intellectual property rights to the celebrity image and persona of" Lapina.  (Compl. ¶ 16.)  In this regard, the 2013 Agreement expressly states that it "shall be binding on, enforceable against, and inure to the benefit of, the parties and their respective . . . permitted assigns. . . representatives and executors," (2013 Agreement, ¶ 11(d)), and Gingin has filed suit against Women NY seeking to enforce the 2013 Agreement. Accordingly, Gingin is also bound by the arbitration provision contained in the 2013 Agreement because it has knowingly

16

accepted and sought the benefits of the 2013 Agreement, and is thus estopped from denying its obligation to arbitrate.  See Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. John M. O'Quinn & Assocs., L.L.P., 523 Fed. App'x. 761, 763 (2d Cir. 2013).

## 2. Scope Of The Agreement

As to the second inquiry, the 2013 Agreement contains a broad arbitration clause whereby Lapina agreed to arbitrate any disputes "between the parties hereunder or involving this Agreement." (2013 Agreement ¶ 11(l).)  Plaintiffs' breach of contract claim is specifically based on the terms and conditions set forth in the 2013 Agreement, barring the Plaintiffs from disavowing the arbitration clause contained therein.  Moreover, the related statutory and common law claims plainly constitute disputes between the parties, and thus fall within the scope of the arbitration clause.  See Hartford Acc. & Indem. Co. v. Swiss Reins. Am. Corp., 246 F.3d 219, 223, 226 (2d Cir. 2001) (provision stating: "in the event of any difference arising between the contracting parties it shall be submitted to arbitration" was "unquestionably sufficiently broad"); see also Kowalewski v. Samandarov, 590 F. Supp. 2d 477, 491 (S.D.N.Y. 2008) (holding that "Plaintiffs' claims fall within the broadly

17

written arbitration clause that covers 'any claim or controversy whatsoever' between the parties"). The claims also involve the 2013 Agreement, inasmuch as all of the claims against Women NY stem from its purported actions in granting a license for the use of Lapina's image and otherwise failing to provide proper advice and guidance to her, as required by the 2013 Agreement.

Under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25, and:

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

Kowalewski, 590 F. Supp. 2d at 489 (citations omitted).

The Second Circuit held that the issue of whether a dispute is subject to arbitration, i.e., "the question of arbitrability," must be resolved by an arbitrator where, as here, the parties incorporated the AAA rules into their agreement. See Contec, 398 F.3d at 208-11 (2d Cir. 2005) (holding that the incorporation of AAA Rules into arbitration agreement constituted "clear and unmistakable evidence of the

18

parties' intent to delegate" any issues pertaining to the existence, scope or validity of the arbitration agreement to the arbitrator); Cartagena Enters., Inc., 2013 WL 5664992, at *3 ("The Second Circuit has held parties who incorporate AAA rules into their Agreement are assenting to arbitrate issues of arbitrability" such that "AAA Rule R-7(a), allowing the arbitrator to determine her own jurisdiction, governs").

Here, the arbitration clause provides for the mandatory arbitration of all disputes "between the parties hereunder or involving this Agreement . . . in accordance with the Commercial Arbitration Rules of the [AAA] then in effect." (2013 Agreement ¶ 11(l)).  By incorporating the AAA rules into the 2013 Agreement, the parties evidenced their intent to delegate any issues relating to the arbitrability of Plaintiffs' claims to an arbitrator.

Plaintiffs' assertion that Women NY's motion to compel arbitration should be denied "because the purported signatories [to the 2013 Agreement] were two New York State Corporations that had been dissolved before the contract date, a fact the Complaint alleges was fraudulently concealed from the Plaintiff, and . . . because the contract is illegal under the New York State General Business Law, Article 11," (Krasner Decl. ¶ 2), is

unavailing.  So is Plaintiffs' contention that the 2013
Agreement is illegal under Article 11 of the New York General
Business Law.


The United States Supreme Court has held repeatedly
that such arguments should be rejected because "a challenge to
the validity of the contract as a whole, and not specifically to
the arbitration clause, must go to the arbitrator." Buckeye
Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 448-49 (2006);
see also Cole v. Pearson Educ., Inc., No. 10 Civ.
7523(JFK)(RLE), 2011 WL 4483760, at *5 (S.D.N.Y. Sept. 28, 2011)
("[a]n arbitration clause is not rendered invalid by a challenge
to the contract as a whole").  In Cole, the Honorable John F.
Keenan rejected the plaintiff's argument that a license
agreement and the arbitration clause contained therein was
unenforceable because the defendant fraudulently failed to
disclose certain allegedly infringing acts at the time of the
formation of the license agreement, because "such allegations
clearly go to the validity of the contract as a whole and are
not specific to the arbitration clause." Cole, 2011 WL 4483760,
at *5; Ralph Lauren Corp. v. U.S. Polo Ass'n, Inc., No. 13 Civ.
7147, 2014 WL 4377852, at *6 (S.D.N.Y. Sept. 4, 2014) (holding
that it was up to the arbitrator to decide plaintiffs' claims
that they were fraudulently induced into signing the agreement

containing an arbitration clause because the "claims only go [to] the formation of the contract as a whole, and not to the agreement to arbitrate. . .").

Similarly, in Asset Mgmt. Assocs. v. Emerson Telecom. Prods. LLC, No. 08-CV-2506(TCP)(ARL), 2011 WL 318100 (S.D.N.Y. Jan. 25, 2011), cited by Plaintiffs, the court denied as futile a proposed amendment seeking to assert a claim of fraudulent inducement specifically as to the arbitration clause.  According to the Second Circuit, any such claim would require a showing of a "substantial relationship between the fraud or misrepresentation and the arbitration clause in particular". See Garten v. Kurth, 265 F.3d 136, 143 (2d Cir. 2001) (citations omitted).  Here, unlike in Emerson, Plaintiffs do not make any allegations of fraud specifically directed to the arbitration clause at issue.

Plaintiffs' contention that the 2013 Agreement is illegal must also fail as a broad attack to the validity of the contract as a whole.  See also Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 71 (2010) (holding that even "where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract – we nonetheless require the basis of challenge to be directed

specifically to the agreement to arbitrate before the court will intervene"); Preston v. Ferrer, 552 U.S. 346 (2008) (holding that a dispute concerning the legality of a contract, based on whether petitioner acted as an unlicensed talent agent in violation of applicable law or as a personal manager not governed by the relevant statute, must be resolved by an arbitrator since respondent sought invalidation of the contract as a whole, and made no discrete challenge to the validity of the arbitration clause).  By incorporating the AAA Rules into the arbitration clause, Plaintiffs delegated to the arbitrator the power to resolve all disputes concerning "the existence or validity of a contract of which an arbitration clause forms a part."  See AAA Commercial Arbitration Rule 7.  The arbitrator must resolve Plaintiffs' challenges to the enforceability of the Agreement.[4]

---

[4] Additionally, it is worth noting that on October 8, 2014, Plaintiffs' counsel, Bennett D. Krasner, Esq., admitted in open court that Women NY "is not an employment agency."  (Kaplan Decl., Exh. A at p. 12, lines 8-13).  On October 14, 2014, Mr. Krasner submitted a declaration to this Court which directly contradicted his prior statement.  In that declaration, Mr. Krasner claimed that the 2013 Agreement is illegal because Women NY is an employment agency under Article 11 of the General Business Law, and that the fees it charges under the Agreement violate Article 11.  (See Krasner Decl. ¶¶ 26-28).

"The Second Circuit has held that 'statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney.'"  Wechsler v. Hunt Health Systems, Ltd., 2003 WL 22764545, at *2 (S.D.N.Y. Nov. 21, 2003) (citations omitted).  Here, Mr. Krasner's statement that Women NY is not an employment agency is admissible against Plaintiffs as a party admission.  By admitting that Women NY is not an employment agency, Plaintiffs cannot now claim that the Agreement is illegal because Women NY is an employment agency covered by the General Business Law.

### 3. Federal Statutory Claims

The third inquiry involves the arbitrability of any federal statutory claims asserted, i.e., Plaintiffs' Lanham Act claims.  See Genesco, 815 F.2d at 844.  "It is well settled that federal statutory claims can be the subject of arbitration, absent a contrary congressional intent."  Oldroyd, 134 F.3d at 77 (citations omitted).  "The burden of showing such legislative intent lies with the party opposing arbitration."  Id. at 78.

Plaintiffs allege one federal statutory claim, a violation of the Lanham Act, as well as violations of the New York Right to Privacy Statute.  Lanham Act and New York Privacy Statute claims have been held to be subject to arbitration. See, e.g., Doctor's Associates, Inc. v. Distajo, 107 F.3d 126, 128, 130-34 (2d Cir. 1997) (granting petition to compel Lanham Act claim to arbitration); TDG Acquisition Co., LLC v. Vuzix Corp., No. 13-CV-6035-CJS-MWP, 2013 WL 1915809, at *5-9 (W.D.N.Y. May 8, 2013) (granting motion to dismiss Lanham Act and common law unfair competition claims in favor of arbitration); Kamakazi Music Corp. v. Robbins Music Corp., 1980

---

Additionally, Plaintiffs have relied on Shelton v. Elite Model Mgmt., Inc., 812 N.Y.S.2d 745 (N.Y. Sup. Ct. 2005).  However, in that case, the court did not hold that the model management agreements at issue were void and unenforceable.  To the contrary, it held that '[w]hether the incidental booking exception applies in this case is not an issue that can be resolved on a motion to dismiss."  Id. at 756.

WL 1159, at *1-3 (S.D.N.Y. June 5, 1980) (granting motion to compel New York Civil Rights Law claim to arbitration).

Given that Plaintiffs' statutory claims are arbitrable, Plaintiffs' "pendent state law claims are also arbitrable." Kowalewski, 590 F. Supp. 2d at 491 (quoting Norcom Electronics Corp., 104 F. Supp. 2d at 206 (S.D.N.Y. 2000) (internal quotation marks and citations omitted)).

### 4. Whether To Stay The Proceedings

In light of the fact that all of Plaintiffs' claims against Women NY are subject to mandatory arbitration, this action will be dismissed subject to renewal following the outcome of arbitration. See 9 U.S.C. § 3 ("[T]he court . . . upon being satisfied that the issue . . . is referable to arbitration . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . ."); Murray, 2014 WL 285093, at *14 (staying action pending resolution of arbitration); Guida v. Home Sav. of Am., Inc., 793 F. Supp. 2d 611, 620 (E.D.N.Y. 2011) (same); Kowalewski, 509 F. Supp. 2d at 491 (dismissing action "[w]here all of the issues raised in the Complaint must be submitted to arbitration") (citations omitted).

24

**Conclusion**

      The motion of Women NY is granted, the Plaintiffs are directed to arbitrate in accordance with the 2013 Agreement, and this action against Women NY is dismissed subject to renewal after completion of the arbitration upon letter application without additional filing fee.

      It is so ordered.

**New York, NY**
**February 6 , 2015**

                                                 **ROBERT W. SWEET**
                                                  U.S.D.J.

25